Good morning. May it please the court, my name is Elizabeth Oberlin. I represent Eric Moore, the appellant plaintiff in this matter. Mr. Moore has been employed with the United States Postal Service since 1993. He brought race discrimination claims and retaliation claims in district court. All of Mr. Moore's claims were dismissed on summary judgment, and I have appealed on his behalf the disparate treatment and the hostile work environment claim. In making their ruling, the district court excluded important evidence based on relevance, which Mr. Moore offered, of other race discrimination that had occurred in the Portland district. Although I understand that appellant courts extend broad discretion to district court's evidentiary rulings, the district court, in making the ruling that it did, in effect, by just stating that evidence of conduct which occurred prior to July and August of 2008 and which involved other supervisors, was making a very general ruling. In doing so, it viewed Mr. Moore's claims in a vacuum without giving regard to the context of the whole picture of race discrimination, which is- Can you give us your strongest example of evidence that was- Yes. Relevant, so much so that we should overrule the district court on it? Yes. That would be the evidence, the testimony of Luther Johnson, a postal employee who applied between 18 and 20 times over the course of two to three years to become a 204B supervisor, which is one of the claims that Mr. Moore has made. The district court erred in stating that Mr. Johnson did not, in fact, believe that it took him so long to obtain one of those positions based on his race. Mr. Johnson testified in his deposition that he believed that the reason it took him so many times to obtain a 204B supervisor position was because of his race. So what you're suggesting is that the district court should have been trying two cases, basically Mr. Johnson's case, to establish the credibility of that, or the jury would, and then also whatever happened to Mr. Johnson would then be relevant because one could infer whatever happened to Mr. Johnson happened to your client? Well, I'm not suggesting that they would be trying two cases. I'm suggesting that- It sounds like it would if you're talking a whole course of conduct for Mr. Johnson. I'm suggesting, Your Honor, that the testimony that Mr. Johnson would be able to provide is relevant in that it's another example of how African Americans in the postal district here in Portland have not been given the same opportunities. Well, aside from the fact that Mr. Johnson is African American, how does one infer from whatever happened to him was based on race without your proving the same case you're trying to make on behalf of Mr. Moore, proving that actually Mr. Johnson was also a victim of racial as opposed to some other rationale for not getting those positions? Well, that would be something for the jury to determine in terms of his credibility as a witness. But it's also for the court to decide how many cases the jury is supposed to confront in trying to decide something. Yes, I understand. And it is my opinion that that's evidence of discrimination which occurs and has occurred. You were trying to establish a pattern in practice. That's correct. How many post offices are there or post office facilities are there in this district? I don't know how many facilities there are. I believe Ms. Lorenz could probably answer that for you. Twenty-seven. And I know there are different facilities. There's the customer service. I don't need all the details. Twenty-seven, lots of different facilities. And the district court indicated that there was no evidence that your client, Mr. Johnson, ever worked at the same facility or ever had the same supervisors. That's correct, Your Honor. So how is it that what happened, one episode that happened to one person amongst 27 facilities, is relevant to what happened to somebody else at a different facility at a different time supervised by different people? That brings me to the other piece of evidence that is important that was excluded, which was in 2005 there was a roundtable meeting of some higher-level postal employees who came in from Denver, the Western District, and met here in Portland to discuss the issue that African-Americans were having a difficult time being promoted or having upward mobility equal to non-African-Americans here in this district. So my point is that it's endemic within the postal district here in Portland. Okay. Could you address, in Mr. Moore's case, your contention that he was denied the supervisor position by his two supervisors who claimed he didn't put in the right kind of application in any event they weren't aware of his interests? Yes. Could you address that? Absolutely. Mr. Moore submitted his profile to the Leadership Skills Bank, which was established after this roundtable meeting, and the purpose of it was to make it more fair for individuals who were trying to get positions and obtain upward mobility in the Postal Service. Mr. Moore believed that that was a sufficient way for him to enter his profile and explain that he was interested in a 204B position. There are no policies about the Leadership Skills Bank. There was plenty of testimony and evidence in the record that the Leadership Skills Bank is an appropriate method for individuals to put their application in for a 204B supervisor position. So assuming that, let's accept that, then how does that link up with the persons who did not appoint him or give him that temporary supervisor position? Don't they have to have known that he wanted it? So where's the evidence that they would have known? Yes, Your Honor. Or that they actually did know? I understand what you're saying. The evidence is that it was fairly common knowledge there in that particular post office where Mr. Moore worked that he wanted to be a 204B supervisor. There is evidence in the record that an individual by the name of Deborah Morton Hamlet, who was a shop steward, in fact spoke to one of the supervisors, Robert McVicker, and inquired about Mr. Moore becoming a 204B supervisor, and the response was that he would never become one because of his attitude. And Mr. McVicker was also the person with whom Mr. Moore had called a racist and had gone in and spoken to his supervisor about that issue. What year did that exchange take place? That was in 2008. I would like to reserve some time for rebuttal, and I see that I only have 2.39. Okay. You may. Thank you. Thank you. Counsel. May it please the Court. Katie Lorenz for the U.S. Postal Service. There was a very narrow question before the district court in this case, and that question was did Mr. Moore's race play any role in him not receiving a 204B assignment in the summer of 2008? There were two key facts that were not in dispute before the district court and are not in dispute before the district court. The first fact is that Mr. Moore was absolutely silent throughout the entire year of 2008 about his desire to take on a 204B assignment. But he had posted on the skills bank that he was interested in a 204B. Why wasn't that sufficient? He posted that sometime at the end of 2005 or the beginning of 2006, and then he updated his profile in April of 2007 after he failed out of the supervisory program for the first time. He then actually received a 204B assignment himself in the fall of 2006, so after he had initially input his information into the leadership skills bank. And the way that he got there were actually two 204B assignments that he received in the fall of 2006. And the way that he got those assignments was that he went up in person to a supervisor at the postal service and said, I believe that the reason I failed out of this supervisory training program is because I didn't yet have any 204B experience. And within a week, he had a three-week assignment. So this process was just very informal. This process was very informal. You do whatever. I mean, you let them know in the ether that you're interested in it. Not know in the ether. You have to go up and say something to a manager or a supervisor on your shift and let them know that you'd be interested. And typically, employees Is there a rule in the post office that says that's how you apply for a 204B? It's not written anywhere. It is. There are no written policies about how these assignments are given out. They are temporary higher-level assignments, so it's not technically a position. But sometimes they're long-term, right? Isn't that right? Yes. And, in fact, to clarify briefly something that my Does the employee get the added pay? Yes. Yes, there is some additional pay for this. Sometimes these assignments last for a few weeks, as in the case of Mr. Moore when he received one of the 204B assignments in the fall of 2006. Sometimes they last for years. And Mr. Johnson, actually, just to clarify briefly, he was serving as a 204B for 15 years. He wasn't applying for that position for 15 years. And that's contained in record, in Excerpt of Record 173. So these assignments are given out very informally. I understand. He posted, he actually interviewed for one, didn't get it because he didn't have 204B experience or whatever. That's what he thought. So then he talked to his supervisor and said, I would like another shot so I can get it. And you say he got it in 2006. He didn't interview for one, actually. What had happened was that He got it, though. He did. Okay. Whatever. He got it in 2006. By orally requesting it. Let me finish my question. Okay. Sorry. Okay. He got it in 2006, right? Correct. Okay. Then how long did he hold that? He had two different 204B assignments. The first one lasted three weeks, I believe, and the next one lasted approximately a month. He had these two assignments between the two times that he was enrolled in the Postal Service's 16-week ASP training program. Fine. He got them. Okay. So then now he's out of it. Now what is the year in which he claims he should have been considered? Now we have to fast forward all the way to July and August of 2008. Nothing has happened. When was he out of the last 204B? The fall of 2006. Okay. We fast forward two years. Is that it? A year and a half. A year and a half. Eighteen months. Okay. So he hasn't changed. He still has his name on the profile. Correct. He's interested. Correct. Right? So in this informal setting, why wouldn't it be logical to assume that he was a standing candidate for a 204B position? It's not logical because Mr. Moore himself knew that the way he actually got a 204B assignment was by going and orally asking someone for one. But there's no requirement that he has to do that, correct? There is a requirement that the managers that he's speaking to, that he's dealing with, know that he wants to do this assignment. And the record is absolutely clear that his managers and supervisors, the one who's going to do it. Whether they actually knew is a different question. As I understand what happened in the district court, the district court knocked this case out, primarily on the lack, a failure to establish a prima facie case. He couldn't prove that he had applied. That's correct. It looks to me, given the informality, and I only speak for myself, that his posting of his profile in this manner was probably sufficient, given the informal nature in which these jobs were made available. Based on this record, it was not sufficient. There was not a single employee that got a 204B assignment based off of the leadership skills bank. So that is in the record. It's also in the record that Mr. Moore went. Even if he gets past the prima facie case and he gets to the next step, which is what you argue in your brief. Then we get to the fact that the Postal Service has offered the fact that these managers were not actually aware of his interest as its non-discriminatory response to why this was not a pretext for racism. Is there any evidence in the record that disputes that fact? There is not. And in fact, right in black and white in the record, it appears on Mr. Moore's leadership skills profile, which he printed out and submitted to the district court, that the last time any manager at the supervisor reviewed his profile in the leadership skills bank was in October of 2006. And in fact, the manager who reviewed that profile was not any of the managers that he alleges discriminated against him in the summer of 2008. In the district court's screen that's out on prima facie case, did the district court ever address the issue of pretext? The district court did not get to that step, no. Did it ever come up in the context of the arguments in the district court? The district court did not separate. Did you make the argument that even if he was out there and you don't knock him out because he didn't apply, did you present evidence on the issue of whether they actually knew? I did. I made that argument both in the brief before the district court and during oral argument on the summary judgment motion. And if I may point to the record, too, that both Ms. Reba Kersey and Mr. Tim Chamberlain, who are the two supervisors for whom Mr. Moore submitted deposition transcripts for this case, it is undisputed on this record that they did not actually know of his interest in doing a 204B. And that's at SER 4 through 7 and at ER 317. And, in fact, Ms. Kersey was utterly confused about why she had even been called in for a deposition in this case. She used the words that she was angry. She was frustrated. She didn't have any idea what involvement she had with Mr. Moore with any sort of discrimination allegations in 2008 because she had no clue that he wanted this position. And, in fact, looking through her testimony, it appears fairly obvious, in fact, that had she only known that Mr. Moore was interested in a 204B position, he would have gotten one. What she testified was that there are plenty of 204B opportunities on a regular basis, that just about anyone who requests an assignment can get one, so long as they don't have a poor disciplinary record or poor attendance. And she didn't personally know of anyone who was turned down for a 204B assignment when they had requested one. So based on that record, the irony here is that had Ms. Kersey known that Mr. Moore was interested, he would have gotten the assignment, and, in fact, did later in 2009. And continued to serve in that capacity as of the time that his deposition was taken in this matter in February of 2010. If I may, I would just like to touch, too, on the issue here of fundamental fairness. I think that in this case we have a plaintiff, an appellate, who was not treated any differently from any other employee at the Postal Service. He wasn't trained any differently in the Leadership Skills Bank. When he did receive that training in the fall of 2005, he wasn't told anything differently. He didn't have a manager who pulled him aside in 2008 and said, look, I've heard you want to be a 204B supervisor. Go put your information in the Leadership Skills Bank, you know, kind of with a nod and a wink, and then that application was ignored in favor of other people who participated in the more informal process. There was nothing different about that. You also mentioned some evidence about remarks saying that he would never get a supervisor position because of his attitude. Yes. That appears in Deborah Morton Hamlet's affidavit at ER 91, and there is actually no time frame listed in her affidavit. And so it's unclear when she had this conversation with Mr. Chamberlain. And further, even if that conversation had taken place in 2008, again, I think it goes to the fact that there is no pretext for race discrimination on the Postal Service, because what Mr. Chamberlain allegedly said at some unknown time was he wouldn't give Mr. Moore a 204B assignment because Mr. Moore had a poor attitude. And what we know from the record is that attendance, discipline, and attitude were the three factors that the Postal Service looked at for hiring a 204B. So what Mr. Chamberlain said at some point in time to Ms. Morton Hamlet was that Mr. Moore was actually not qualified on his own merits. I see that I'm just about out of time, so thank you. Thank you. I'll submit. Your Honors, I'd like to comment on a couple of points that Ms. Lorenz made. She made a statement about Mr. Johnson, Luther Johnson. Forget Johnson. Let's talk about pretext or argument. Did you put any evidence in to rebut the testimony that was proffered, that the supervisors weren't aware of his interests? Well, Your Honor, as I stated earlier, the supervisors were aware because there was a general knowledge and Mr. McPicker was aware. That was your evidence. That's correct. Okay. All right. Thank you. The other thing that I'd like to point out is that Mr. Moore believed that the Leadership Skills Bank was an appropriate method to express his interest and to get one of these positions because he himself had been at that 2005 roundtable meeting, had spoken out, and then later was under the impression that this Leadership Skills Bank was put into place for this very purpose to make applications. Why is his understanding important? If there's no evidence that other people understood that this Skills Bank was the place to turn, if he understood differently, that doesn't demonstrate that other people were disregarding his application if they didn't think that was the right way to apply. I understand what you're saying. And there is evidence in the record that there were supervisors who testified at their depositions, including Duncan Santoro and I believe Mr. McPicker, that in fact it was an appropriate method to list your profile in the Leadership Skills Bank if you were interested in obtaining one of these 204B supervisor positions. So your position is that once you're on that posting, automatically you are a candidate for any 204B opening? If you have, in fact, put on your profile, as Mr. Moore did, that he was interested in a 204B position, yes. In certain areas, certain skills. Correct. I'm not sure if they call them skills. Whatever. They are limitations. You can list what area and what type of position you're looking for. Absolutely. And in terms of his first, his 2006 time as a 204B supervisor, when he approached someone, that was a different circumstance. He did that because he had failed the ASP program and he wanted to explain that he thought this would be the thing that would help him get through. I see that I'm out of time, at least I think so. Okay. Thank you very much. Thank you, Your Honors. Thank you, counsel. We appreciate the argument. Moore is submitted.
judges: Fisher, Paez, Clifton